NOVARTIS VACCINES 2010-12-64 and 1301, Mr. Batke. May it please the Court. Your Honor, I'll try to bring clarity to our issues. Well, let me tell you one thing that I found quite confusing in the blue brief, and that is the references to what people knew at the time of the 989 priority application, which seems to me to be utterly irrelevant. The question is whether the 447 and 620 patents were rendered obvious, and that has to do with what's in those patents, not what's in the priority application. There may be ultimately, if there is an interference, a question of priority, but what was known at the time of the priority application is irrelevant, is it not? Well, what's known in the priority application, except in terms of... You're right. That's the best answer to some of those questions. I knew where you were going with that, Your Honor, so I figured I'd just short-cut that. Both groups, Genetics Institute and the other group, Novo and Chiron, basically set out to do the same thing, which was to come up with a truncated factor VIII protein, because for manufacturability purposes. They both came up with a truncated factor VIII, which more or less deleted the B domain. But there's a big difference between them. There's a difference in 41 amino acids. That's a big difference. And those 41 amino acids mattered, didn't they, in terms of the von Willebrand factor? Well, assuming, Your Honor, I would say that's true, assuming that they claimed that, that Novartis claimed that and actually disclosed that, but they didn't. They didn't know anything about where von Willebrand's factor actually bound. Nobody knew that it was on VIII. But how does a protein with a certain number of amino acids necessarily render obvious, or even create a prima facie case for another one with a difference of 41 amino acids? Well, the Genetics Institute patent, the 112 patent, claims from 581 up to 949, and then you've got the Novartis, which are 808, or I'm sorry, 889 to 909. You're not questioning the difference of 41 amino acids. Well, I will. I will question that, because what Novartis assumes and what the district court assumes is that there's no changes in that 41 amino acids of the Novartis, which simply points out has this 90 percent identity requirement. Your point is that the 447 and the 620 patents don't preserve the A3 region, right? Correct. So they really do not, the claims are so broad that they are not limited to preserving the A3 region, and therefore that they don't represent a new invention. Basically, that's your contention, right? That's correct. That's correct, Your Honor. And, you know, there's some real evidence and record on this, because this Leyte article points out, and now this was work that was done later on, at position 1680, which falls right in that A3 range. What he determined was that if you substitute phenylalanine for tyrosine at one spot, 1680, you destroy the von Willebrand's factor binding. Now, they don't address that article or this evidence, which came before the district court, and the district court doesn't address it either, but just that one change makes a huge difference in terms of the von Willebrand factor binding. So those inventors of the Chiron patent, they didn't understand this either, nor do they preserve A3, and that's really the linchpin of their entire case, and that's what the district court relied on. And so once you are able to shoot that down, which I think we have, and I think factually we have, you know, their case basically falls apart after that. And just to take it to another level, this 90% sequence identity, Your Honor, allows them to substitute something like 68 amino acids in both the heavy chain and 68 in the light chain. Now, if you substitute 68 in the light chain, I mean, you have freedom throughout that entire range. So you could conceivably substitute that entire 41 range of amino acids with other amino acids. And the patent, 447 patent, column 4, line 45, actually permits you to make non-conservative substitutions. They don't have the binding site anymore. They don't have the binding site. That's exactly right. In fact, they may not even have A3. They're still different structurally. Substantially different, aren't they? No, I mean, the goal of the researchers on both was to delete as much as you could without destroying coagulation. That was the goal of both of them. Neither of these parties set out to retain von Willebrand's binding factor. So that may be somebody else's invention. Somebody else discovered that. But putting the von Willebrand factor aside, it's still quite different structurally. And even if one doesn't rely on the von Willebrand factor activity, you're still talking about a material of a certain number of amino acids renders obvious another one with quite a number of different amino acids. Well, I'd like to address that, Your Honor. I think it's a good question, something we need to come to grips with. We go up to 949 amino acids. They go up to 909. What we say is that if your goal, if you're looking at these patents, the goal was to come up with the largest number you could and still retain coagulation activity. Somebody of skill in the art, and there was evidence in the record at the district court from the expert, Dr. Fay, that you would know. It's just common sense under KSR that if I can delete 949, I can go to 909? You can be much clearer about this. Your argument is that it isn't rendered non-obvious because it claims something that has no utility. Basically, that's your argument, right? Because of the breadth of the 447 and the 620. They allow the deletion of the A3 binding site. And therefore, these claims cover things that have no utility with respect to binding. And the question is, if there is a different structure as there is in the 447 and 620 patents, if there's no utility to that different structure, that doesn't prevent them from being rendered obvious. That's basically your argument, correct? Correct. And no specific cleavage points that they actually refer to. Those cleavage sites were known to the art. In fact, Toole of Genetics Institute, the inventor, the primary inventor under 112, disclosed those in the priority. He said there's natural cleavage sites at position 740 and also at 1649, which is the beginning of A3. So everybody knew that these were natural cleavage sites. So it would be obvious to employ those naturally occurring cleavage sites to the larger deletion range that you see in the 112 patent. And so it's not only common sense to be able to delete. If I can go up to 949, you actually had direction in the prior provided by Genetics Institute, or actually Chiron had this instruction from Genetics Institute as well. The other thing I want to point out about this A3 region is there's a little bit of confusion because the court may be aware that there's another action in Texas between where Novartis has sued Wyatt. And down in Texas, and we have provided the claim construction brief of Novartis, they actually say you can have deletions. That 90% sequence identity element also includes deletions. So not sure what their position is. They haven't really addressed the substitution issue here. The district court didn't address it. And down in Texas, they're saying something else. So it either allows deletions or not. And if it does allow deletions, then you can delete all of Novartis' patents. If we're done with that, I wanted to ask you about the jurisdictional question. Yes, Your Honor. Are you familiar with the Gwynn case, which I don't think either party mentioned? No, I'm not, Your Honor. Well, the Gwynn case is an interference case coming from the PTO. And it involved the same facts, apparently, as Albert. That is a disclaimed patent during an interference proceeding. And Gwynn, unlike Albert, says, oh, no, that doesn't affect the board's ability to, or the PTO's ability to have an interference proceeding as long as the disclaimer took place after the proceeding was initiated. I don't understand how those, they're both written by Judge Rich. I don't understand how those cases are consistent. But you can't address it because, you know. Well, all I can say is, I don't think, I mean, to the extent that Albert says you lose jurisdiction, I would submit that that's wrongly decided. The strongest language to that effect is, in a footnote, it seems to be dicta. And I think it is contrary to, you know, dozens, hundreds of years of jurisprudence in this country, that jurisdiction is established as of the time the complaint is loosened if there's a change of circumstances amounting to mootness. And I don't think any of the parties here say that these issues are moot because- 112 has expired now, right? 112 is expired now, yes, Your Honor. But the outcome of this proceeding will impact on the Texas case because these same patents, the same Novartis patents, are in suit in Texas. So there's a real-world, there's a real-world impact on Novartis. But does this, does it make any difference in this case whether the interference is declared with respect only to Claim 9 or whether it includes Claims 1, 5, and 10 as well? I don't think it makes any difference. Okay. I don't think it makes any difference. I don't think it makes any difference. Okay. Well, we say that they do. I mean, when the patent term extension application was filed, the owner only identified Claims 9 and 10, but they're dependent from Claims 1, for example, and Claim 5. So in our view, all of those claims were part of the patent term extension because of the dependency issue. You want to save the rest of your time? I didn't. I actually made a note with the clerk, Your Honor, and I was a little concerned about that. Thank you for bringing that up. Mr. Riley? Good morning. May it please the Court. These are fundamentally different ranges, dramatically different. Well, they are different ranges, but the problem is that the ranges claimed in the 447 and 620 patents appear to claim things that would allow elimination of the A3 binding site, correct? If one substituted in that region, contrary to the teaching of the patent. Well, maybe contrary to the teaching of the patent. There is Column 4, which seems to suggest a substitution. But let's assume, suppose this is correct, that the claims cover a range that would eliminate the A3 binding site. So under that assumption, then why aren't these 447 and 620 patents obvious over the 112? Well, the question is, are they obvious in light of what TOOL teaches and the claims of TOOL? TOOL says nothing about substitutions, nothing at all. But if part of, if the claims are partially inoperative, what does that do to the obviousness analysis? The claims, the Novartis claims are completely operable because... Well, not if the A3 site is deleted. It could still have coagulation. Well, sure, but so that was present in the 112. And it could serve as, for example, an assay. There are other utilities associated with a molecule that doesn't include that. Well, let's suppose there were no utilities. The scope of the claim went beyond anything that was operative or had a utility. I mean, would then the 112 render them obvious? No, because it is describing a different genus, which is a huge genus, 68,000. In other words, the presence of a common activity doesn't render one obvious over the other. It's a structural question in terms of prima facie obviousness. That is correct. And here, under your opinion, in the Peterson case, the tool claim of 68,000 different varieties is such a large area, it doesn't really qualify as a genus because it includes deletions that are into another functional area. And since it is so large, as Judge Robinson held in this case, it doesn't render obvious. Well, I'm not understanding that. I mean, the question I was asking you is if, in fact, the claims of the 447 and the 620 don't preserve the A3 area, in other words, they cover deletions which would eliminate the A3 area, and therefore they don't claim preservation of the binding site, why aren't those claims obvious over the 112? Because the nature of the claim is that they are permissive substitutions. The required deletion, which characterizes the Novartis claims, does not invade that. And I would really like to speak to this case, but I'm not aware of it. They set out to get a coagulant, but one that was stable, one that mimicked the function of factor VIII in human plasma. Well, we don't necessarily care what they thought. The question is what the patent says on its face, and the patent does not talk about preserving the A3 binding site. It doesn't, but it does talk about preserving, in the specification, von Willenbrandt factor binding. And in experiment number five, which is described in the specification, it discusses making one substitution in the light chain, in the A3 region, and it says, it offers the view that to make further substitutions could affect von Willenbrandt factor binding. So the kinds of substitutions that are discussed are conservative substitutions to permit better expression. Could one make 10% substitutions and eliminate the von Willenbrandt factor effect? One could, but the patent teaches away from doing that. Well, where does the patent teach away from doing that? It seems to me, in fact, if you look at column four of the specification, that the patent suggests a substitution that would have that effect. If you look at column four, line 45, doesn't that teach a substitution that would eliminate the A3 binding site? If you found the exact amino acid and made exactly that substitution, but the examples of substitutions that are discussed in the specification are substitutions to enhance expression. For example, changing the first amino acid from glutamic acid to a serine. That's discussed, and an experiment is performed on the nature of that substitution. That substitution preserves von Willenbrandt factor binding. Do you maintain that that is irrelevant to the structural non-obviousness? I agree with you, Judge Lurie, that the structural non-obvious is obvious on its face. Well, I just ask questions. I decide later with my colleagues. But the proper two-way test is does TOOL, and you look at the claims of TOOL as well as what was known in the prior art, does that render obvious a very different range? And TOOL says nothing about the B region. TOOL says nothing about stability. TOOL discusses factor VIII from pigs and makes his determination of where to delete based on homology with factor VIII from pigs. Well, suppose, and this is really a legal question, so let's ask a hypothetical. Suppose the second patent preserved some range that was deleted in the 112, but hypothetically that that preserved range had no utility, whatever. Is the second range non-obvious if it has no utility? I believe under the two-way test it is still non-obvious. What case would say that if it lacks utility that it's non-obvious? The issue is when you, and again, Peterson, which examines this very question, you ask yourself, does TOOL render obvious the patent and vice versa in the two-way test? And again, there's nothing in TOOL that would suggest choosing a smaller range because TOOL, it has no recognition. I think you're departing from my hypothetical. My hypothetical is there's no utility to the preserved range in the second set of patents. There's no utility at all. It's just a structural difference that hasn't shown to have any benefit, whatever. Is that second patent non-obvious? If that is known, if that is reflected in the prior art in the TOOL patent, there needs to be some motivation for going to a different deletion. Is the utility of all of these materials within the scope of the claim that issue on appeal here? The utility within the scope of the claim. In other words, the question that Judge Dike is asking. The utility... Does that relate to an issue on appeal here? No, it doesn't. The only issue is whether the court properly found in light of these particular claims that were alleged to be interfering, whether they were obvious in light of TOOL. Yeah, but the obviousness question is here. And my question is whether something is non-obvious just because it's different, if the difference has no significance. If the difference is known in the prior art, not to have any significance. Altafina is an example of that, where you know that a certain range, elements within that range have no significance. If scientists understand that, that's known in the prior art, yes, that would have an impact on obviousness. But in this case, when you read TOOL... You mean at a lower tribunal? Yes. If raised. If raised, which it wasn't in this case. But I would like to turn, if I may... I thought it was raised in this case in the sense that they're arguing that the way these claims are written, they allow deletion of the A3 binding site. But the question of whether there was no other utility was not raised in this case. And what utility was known? I understand what you're saying. I'd like to turn to the issue of jurisdiction because we had no opportunity to respond. Are you familiar with the Gwynn case? I am familiar with that case. How do you reconcile Gwynn and Albert? Completely different statutory provisions. Well, yeah. But the provision for PTO interferences is even clearer that it has to deal with unexpired patents. Yes. And yet we held the disclaimer and the established precedent, the PTO, which is the same result with respect to expired patents. As long as that wasn't expired before the proceeding begins, there's no loss of jurisdiction. Why should there be a difference between an interference at the PTO and an interference at the district court? And I believe Judge Rich addresses that in Albert. And that is because the phrase that is used in 291 is the phrase interfering patents. And that phrase, which has been in the law since 1870, requires live patent claims. Because the issue is as between two people claiming the same subject matter, who has the prior right? In a 135 proceeding in front of the patent office, one party by definition doesn't have rights to the subject matter because the application hasn't issued. And going all the way back to the 1944 decision in Engler, a panel that included Judge Lerner Your argument is it can't interfere if there's no valid patent. That is correct. Let me test that idea a step further with you. Let's assume for the moment that the district court had ruled the interference was valid, i.e. ruled the other way. And let's assume genetics said you can't appeal. What would you say? We would seek a vacatur of that opinion because in light of this court's precedent So you would appeal? If they prevailed and proved it. Yeah, if they prevailed, you would appeal. We would seek an appeal. How could you do that? You just told us there's no appeal. And if this court held, as we believe the precedent clearly requires, that there is no appellate jurisdiction once the patent expires, then we would seek a vacatur. And this court has repeatedly done that. Think of cases involving the International Trade Commission. And one party prevails, proves the patent is invalid, an appeal is taken, and the patent expires during the pendency of the appeal. This court uniformly dismisses those cases, even though, contrary to what GI is arguing, there are real-world consequences. When you say dismisses those cases, you mean dismiss the appeal, or do you mean dismiss the trial judge's judgment? Dismiss the appeal, and they vacated the International Trade Commission. Well, in order for us to do that, we'd have to have jurisdiction, wouldn't we? That's right. And you can dismiss because you don't have jurisdiction, or you can dismiss because the case is moot. Well, we always have jurisdiction to determine jurisdiction. That's basic principle of federal jurisdiction. But I think that the answer to the statutory issue where they raise 135, which says unexpired patents, again, different proceeding. I'm having trouble seeing what there's a difference in language between 135 and, what is it, 261, whatever the other section is. 291. 291. I mean, I don't see the difference in the language between 135 and 291, except that 135 refers specifically to unexpired patents. And it, Your Honor, it is because— Which is cut the other way. It is, Your Honor, because 291 carries forward the language from the old statute, RS-4918, the phrase interfering patents. And that phrase, which was— In other words, you need two patents. You need two live patents. In the patent office, you can have two applications or an application and a patent. Right. It's a different proceeding because one party's rights don't even exist yet. But even that doesn't answer the question, because the question is whether you need two patents at the trial level or do you need two patents at the appeal level. Ordinarily, jurisdiction will attach at the beginning of the case. And then we have jurisdiction over whatever it is the trial judge did, right? No. Judge Rich addressed that issue in the Alpert case and said, under 291, whenever jurisdiction is lost, at whatever stage in the proceeding, the appropriate response of the federal court under 291 is to dismiss the case. And again, this is no different than under 283. But the case doesn't become moot if there was jurisdiction when the case was filed. The case doesn't become moot if one of the patents expires, because damages can still be an issue going back six years, right? Right. But this isn't a damages action. This is an equitable action. And Judge Lurie, in a case, a decision you wrote currently- But our jurisdiction doesn't turn on the remedy being sought. In terms of 291, and Judge Rich held in the Alpert case, under 291, the merits and jurisdiction are inextricably intertwined. The existence of an actual interference, two live patents competing against each other, was the sine qua non of federal jurisdiction. And when one of them expired or extinguished or canceled, whatever the reason, then that's the end of it. At any stage of the proceeding? At any stage of the proceeding. And in the case of Kearns v. Chrysler at 32 Federal 3rd, 1541, an opinion by you, Judge Lurie, that was a case involving the windshield wipers. That's correct. And the issue came up on appeal. They wanted an injunction. The plaintiff said, I want an injunction. Well, during the pendency of the appeal, the patent expired. And this court said, patent has expired. We don't have equitable jurisdiction anymore. The appeal was dismissed. And you agree that if that's the holding, then we should, under Munsinker, we should vacate the decision? My view is that this is an exception to Munsinker because- Why? What created this were the actions of GI. In doing what? In waiting eight years after the patent issue to bring the action. What case says that Munsinker doesn't apply because somebody delays in bringing the action? Admittedly, I do not have a case that says that. Did you raise a latches question? We certainly did raise the fact that they had slept on their rights. And they, in turn, said, we need to get this done right away. They pressed for an expedite. I didn't remember seeing anything in your appeal that looked like latches. No, we haven't raised that on appeal. But we did move to dismiss the appeal because the court no longer has jurisdiction. So if we did that, you'd get the same result? We would- No interference, as no interference, in fact. Right, because the patent is dead. It's expired. And we would go back to Texas. And they would raise this very same issue in terms of a 102 or 103 point. Which leads to my last question. What is going on here? What is a practical matter? What is the perceived benefit of litigating these obviousness issues in the context of an interference proceeding instead of an infringement proceeding? The benefit is that they get two bites at the apple. They went to Delaware, instituted this action. Well, why two bites? I mean, if the thing went to a conclusion, it would be race judicata on the issue, right? That's, I think, what they intended to do. They wanted to race to a judgment. It's an argument about forum selection? Yes. That's all that's at issue here. Exactly. They went to Delaware because they thought they could get a favorable judgment, have that affirmed, use that against in the infringement action in Texas. But in all of these cases, Albert, Engler, and Alberta Communications, that's exactly what happens. The party is saying, I want to have federal jurisdiction under 291, get a favorable result, and use it in some other part of my dispute. But the only difference between the interference proceeding and using it as a defense in the infringement action is which venue that happens. Which venue it happens in. And in this case, they want the first bite at the apple in Delaware, and they'll raise the same issues in Texas. And then finally, with regard to the issue of- How are they going to raise the same issues in Texas if it's decided in Delaware? If this court vacates the decision, because it no longer has jurisdiction, because the past is fine- And assuming we affirm the decision, that's the end of the deal, isn't it? If you affirm the decision on the merits, that's the end in Delaware. They will likely argue that it has no preclusive effect, there's not a parity of parties. They'll make claims to try to avoid the impact of the judgment in Texas. Thank you, Mr. Riley. Mr. Batty has some rebuttal time. Yes, thank you, Your Honor. Are we talking here about anything more than a dispute about venue? No, Your Honor. There's differences in the burden of proof, for example. I mean, Genetics Institute is- No, we're not talking about anything different, or we are talking about something different. Well, it- The no was ambiguous. I didn't know. It was a negative question. There's more than just- I'm sorry, what did you- The question is, as a practical matter, isn't this just a dispute about venue, as to whether this issue of obviousness is going to be tried in Delaware or Texas? No, Your Honor. Okay, why not? Because there's differences in the burdens of proof in Delaware, in the interfering patents action, versus Wyeth as a defendant in Texas. You mean in the infringement action, it's clear and convincing evidence, and that's not true in the interference proceeding? Yes, that's correct, Your Honor. I see, okay. It's a preponderance. So there's a difference there. Plus, Genetics Institute is the owner of the patents. The party being sued in Texas is Wyeth, so it's a different party. Well, is the cutting-edge issue as to the regions covered in the different patents, is that a fact question before us, or is that a question of fact decided by the district judge? I'm sorry, could you- in the significance of that coverage? Well, what the claims cover is a fact question, you know, what the claims cover. But I don't think it's an issue here on appeal exactly what they cover. Okay. The other difference I'll point out is that in Delaware, in the interfering patents action, it's claim versus claim. In Delaware, there's a 102G assert- I'm sorry, in Texas, there's a 102G assertion, so it's disclosure and more than just the patent and against the Novartis claims. So there are different legal issues at stake here. Claim versus claim in Delaware. So the invalidity claim is broader in Texas. Correct. That's correct. So there wouldn't be race judicata in that regard. I didn't hear Mr. Riley say anything about the position, speaking of Texas, that deletions are allowed in A3. And so I think that's basically gone unrebutted, that they've taken that position, that inconsistent position in Texas. One thing I did want to point out is that in terms of the obviousness question, under N. Ray Peterson, this is a case of prima facie obviousness, because you've got the broader range in the 112 patent, and the more narrow range in the Novartis patents. And so that is prima facie obvious. The only thing they've come back with is this A3 von Willebrand's factor argument. And if the court decides that the Novartis patents do not claim that, or that they're not entitled to because of the substitutions or deletions, as they're taking in Texas, then it's basically gone. The prima facie case of obviousness has basically gone unrebutted. They have not even taken on the reverse, the second prong of the two-prong test, and where we say that the Novartis patents invalidate the 112. They haven't really even taken that on. And in particular, they have not taken on our anticipation argument. So that seems to be conceded. Mr. Riley, I've got a few seconds left. You talked about example five and von Willebrand's factor. We've read that, can't find it. I asked Mr. Troutman here to take another look while we were sitting here. We can't find what Mr. Riley says is in there. So I don't think it's in there. And last point. See, I'm running out of time. Finish your last point. OK. If they believed, Your Honor, that von Willebrand's factor binding was something that they invented and it was so important, they could have drafted those claims that way. But they didn't. They provided substitution from amino acid 740 through the end in the light chain, including all 41 amino acids. And they could have started that at 7, you know, at the end of A3. They could have started the substitution. But they didn't. And that just goes to prove they had no idea that they were retaining von Willebrand's factor binding. They weren't trying to do that. They were all trying, all of these researchers were just trying to get a molecule that provided, that had pro-coagulant activity. That's all they were doing. The Novartis inventors were no different than the Genetics Institute inventors. That's what they were trying to do. And so this small range difference is really trivial in terms of what was going on here. Because all they were trying to do was get the largest deletion they could, consistent with maintaining pro-coagulant activity. Thank you, Mr. Badke. We'll take the case under advisement.